LESBIAN/GAY FREEDOM DAY COMMITTEE, INC., et al., Plaintiffs,

v.

UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE, et al., Defendants.

In the Matter of the Petition of Carl HILL, for a Writ of Habeas Corpus.

Nos. C–81–2522 RPA, C–81–4055 RPA.

United States District Court,
N. D. California.

June 17, 1982.

---

Mary C. Dunlap, San Francisco, Cal., for Lesbian/Gay Freedom Day Committee, Inc.

Michael J. Tonsing, Asst. U. S. Atty., Civ. Div., San Francisco, Cal., for U. S. I. N. S. and respondent in No. C–81–4055 RPA.

Donald C. Knutson, Gay Rights Advocates, Inc., Jeff T. Appleman, Berry & Appleman, William O. Dillingham, San Francisco, Cal., for petitioner in No. C–81–4055 RPA.

## OPINION AND ORDER

AGUILAR, District Judge.

The Court has before it two actions challenging, in different respects, the exclusion of homosexual alien visitors from entry into the United States. In *In the Matter of the Petition of Carl Hill*, C–81–4055 RPA, an alien, ordered excluded from the United States because he is a homosexual, brings the challenge by way of a petition for writ of habeas corpus. This case is in essence a "test" case for purposes of determining what requirements must be met for the Immigration and Naturalization Service to exclude homosexuals from entry into the United States.

Because he was an alien having no constitutional right to enter the United States, *Kleindienst v. Mandel*, 408 U.S. 753, 762, 92 S.Ct. 2576, 2581, 33 L.Ed.2d 683 (1972), Hill was unable to directly challenge the propriety of excluding homosexuals from entry. He focuses his challenge on the procedures for such exclusion. The direct challenge comes in the case of *Lesbian/Gay Freedom Day Committee, Inc. v. U. S. Immigration and Naturalization Service*, C–81–2522 RPA. In this case citizens of the United States bring suit contending that the exclusion of homosexual visitors from entering the United States violates the citizens' First Amendment rights to freedom of speech and association.

The Court heard motions in both of these actions within weeks of one another. Due to the closeness in time of these hearings, and because of the interrelationship between many of the factual and legal questions presented by both actions, the Court has decided to join these two cases together for purposes of the presentation of its opinion on the outstanding motions. Before discussing the merits of each action individually, the Court will first set forth the common background to the challenges presented by Hill and by the Lesbian/Gay Freedom Day Committee.

*History of the Exclusion of Homosexual Aliens from Entry Into the United States*

Homosexuals were first considered to be statutorily excluded from entry into the

United States by the Immigration Act of 1917, which prohibited the entry of "persons of constitutional psychopathic inferiority" certified by a physician to be "mentally . . . defective." Ch. 29, § 3, 39 Stat. 874 (1917) (repealed 1952). In 1952 the McCarran-Walter Act repealed the Immigration Act of 1917, and homosexuals were excluded from entry as persons with "psychopathic personality." Immigration and Nationality Act, § 212(a)(4), 66 Stat. 163 (1952). In 1965 the Immigration and Nationality Act was amended to provide for exclusion of homosexuals as persons afflicted with a "sexual deviation." Act of October 3, 1965, Pub.L.No.89–236, § 15(b), 79 Stat. 911 (codified at 8 U.S.C. § 1182(a)(4)). Thus, the current provision of the Immigration and Nationality Act pursuant to which homosexual applicants have been refused entry into the United States is 8 U.S.C. § 1182(a)(4) which provides:

> (a) Except as otherwise provided . . . , the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:
>
> > (4) Aliens afflicted with a psychopathic personality, or sexual deviation, or a mental defect;
>
> .     .     .     .     .

Prior to 1979, it was the practice of the Immigration and Naturalization Service (hereinafter referred to as the "INS") to process applicants suspected of being homosexuals in the same manner as it processed applicants suspected of being afflicted with any other mental or physical defect. Pursuant to this process, the INS refers individuals seeking entry into the United States, whom INS officials suspect are suffering from a mental or physical defect, such as homosexuality, to an officer of the Public Health Service (hereinafter referred to as "PHS") for a medical examination. If the result of the examination is a diagnosis by the PHS official that such a mental or physical defect exists, the officer certifies these findings in a "Class A certificate" to the INS officer. 8 U.S.C. § 1224. This certificate constitutes the evidentiary basis for exclusion at the exclusion hearing. 8 U.S.C. § 1226(d).

On August 2, 1979, the Surgeon General of the United States revised the policy of the Public Health Service and instructed PHS officers not to accept immigration referrals for medical examinations when the sole basis for the referral is to establish homosexuality as a grounds for exclusion. The Surgeon General concluded that "homosexuality per se will no longer be considered a 'mental disease or defect'." Memorandum from Julius Richmond, Assistant Secretary for Health, United States Department of Health, Education and Welfare, and Surgeon General, to William Foege and George Lythcott (August 2, 1979) (hereinafter referred to as Memorandum of Surgeon General).[1] This decision to revise PHS policy was primarily based upon changes in medical thinking.

In 1973, the Board of Trustees of the American Psychiatric Association voted to remove homosexuality from its list of mental disorders. Press Release of American Psychiatric Association (December 15, 1973). Homosexuality had previously been listed under the mental disorder "sexual deviation." Though the Trustees recognize that some homosexual persons may suffer from mental disorder or sexual deviation due to disturbance or conflict with their sexual orientation, the Trustees made it clear that homosexuality per se does not constitute a mental disorder or sexual deviation, and homosexuality per se implies no impairment in judgment, stability, reliability or vocational capabilities. *Id.* The full membership of the American Psychiatric Association approved the action of the Trustees, N.Y. Times, April 9, 1974, at 12, col. 3, and numerous other medical organizations have endorsed the American Psychiatric Association's position. Memorandum of Surgeon General.

1. Documents cited herein are found in the record below in *In re Petition of Carl Hill*, and in exhibits attached by the parties in both actions.

Thus, in making his change in policy, the Surgeon General stated that "the change will reflect current and generally accepted canons of medical practice with respect to homosexuality" since the American Psychiatric Association omitted homosexuality from the mental disorders listed in its Diagnostic and Statistical Manual. *Id.* The Surgeon General specially noted that this manual is "one of the most authoritative diagnostic manuals for the conduct of psychiatric examinations in the United States, and constitutes the complete listing of currently recognized psychiatric diagnoses," and that the PHS relies on the American Psychiatric Association for advice and information. *Id.*

Left without its previous tool for the exclusion of homosexual aliens from entry into the United States, the INS initially allowed all suspected homosexuals to enter the United States conditionally under parole status while it sought counsel from the Office of Legal Counsel from the Department of Justice to determine whether it still had an obligation to enforce section 1182(a)(4) to exclude homosexuals. N.Y. Times, August 15, 1979, at A 14, col. 1. The Office of Legal Counsel informed the INS that it was still required to enforce the exclusion of homosexual aliens even though PHS examinations and certifications were no longer available. Memorandum of John M. Harmon, Assistant Attorney General, to David L. Crossland, Acting Commissioner, INS, (Dec. 10, 1979) at p. 8.[2]

The INS then adopted a new policy for the exclusion of homosexual aliens entitled "Guidelines and Procedures for the Inspection of Aliens Who Are Suspected of Being Homosexual." Press Release of the Department of Justice (Sept. 9, 1980). The Guidelines and Procedures provide that an arriving alien will not be asked any questions regarding his or her sexual preference. However, if an alien "makes an unambiguous oral or written admission of homosexuality" (which is not to include but-

tons, literature, or other similar material), or if a third person who is also presenting himself or herself for inspection "voluntarily states, without prompting or prior questioning, that an alien who arrived in the United States at the same time ... is a homosexual," the alien may be examined privately by an immigration official, and will be asked to sign a statement to the effect that he or she is a homosexual. *Id.* No medical certification is obtained. The unambiguous admission forms the evidentiary basis for the exclusion hearing. It is this policy of exclusion that both protagonists in the present cases challenge.

*Petition of Carl Hill*

On November 5, 1980, petitioner Carl Hill, a citizen of the United Kingdom of Great Britain, sought entry into the United States as a "nonimmigrant visitor for pleasure." On arrival, Hill made an unsolicited statement to the immigration inspector that he was a homosexual. The inspector then issued Hill a Form I–122, "Notice to Applicant for Admission Detained for Hearing Before Immigration Judge," notifying Hill that he appeared to be excludable pursuant to section 1182(a)(4).

At the exclusion hearing held on November 7, 1980, Hill acknowledged that he made the statement that he was a homosexual to the INS officer, and again stated that he was a homosexual. However, the immigration judge determined that Hill could not be found excludable. The judge made this ruling because no medical certification that Hill was afflicted with a sexual deviation or mental defect was made by an officer of the Public Health Service. The judge held that such certification was statutorily required for exclusion under section 1182(a)(4). In his decision the immigration judge stated:

> The stand which the Surgeon General has taken leaves the Justice Department and the Immigration Service in the unenviable position of being charged with the enforcement of a law whose tools of enforcement have been withdrawn.

---

**2.** Further detail of the background of the homosexual exclusion can be found in Note, The Immigration and Nationality Act and the Exclusion of Homosexuals: Boutilier v. INS Revisited, 2 Cardozo L.Rev. 359 (1981).

Without the Class "A" Certificate of the Surgeon General, I am powerless to exclude this man. November 7, 1980, ALJ decision, p. 6.

The INS appealed, and the Board of Immigration Appeals sustained the appeal, holding that a self-admitted homosexual could be excluded from entry to the United States without a medical certificate issued by the PHS. The Board of Appeals reasoned that where the individual seeking entry makes an unsolicited, unambiguous statement that he or she is a homosexual, the individual has failed to meet the burden of establishing that he or she is admissible to the United States. Therefore, the INS is not required to obtain a medical certificate that the homosexual alien is afflicted with a sexual deviation or mental disorder. Decision of Board of Immigration Appeals (July 9, 1981), pp. 6–7.

Hill brings this petition for writ of habeas corpus to appeal the ruling of the Board of Immigration Appeals and to be permitted entry to the United States as a temporary visitor for pleasure. The sole question for which review is sought by Hill is whether the INS can exclude a homosexual applicant from entry into the United States in the absence of a Class A medical certificate by the PHS where the applicant has made an unambiguous statement that he or she is a homosexual.

On April 23, 1982, the Court granted the petition for writ of habeas corpus finding that an exclusion of an alien homosexual from entry into the United States as a person afflicted with a sexual deviation or mental disorder must be based upon a Class A medical certificate certifying the alien to be so afflicted. As such certification was not obtained in excluding Hill, the Court permitted the INS thirty days within which to institute new exclusion proceedings. The Court further ordered that if such proceedings were not instituted within thirty days, Hill would be admitted into the United States as a visitor for pleasure pursuant to 8 U.S.C. § 1101(a)(15)(B), and INS em-

ployees and agents would be precluded from taking steps to deny Hill entry to the United States on the basis of his sexual preference. Order of April 23, 1982. This thirty-day period having run, on May 25, 1982, the INS, through the Assistant United States Attorney, advised the Court that the INS would not institute new exclusion proceedings against Hill. Letter of Michael J. Tonsing, Assistant United States Attorney, to the Honorable Robert P. Aguilar (May 25, 1982). Thus, Hill has now been admitted into the United States as a visitor for pleasure. As the Court has already entered its dispositive order, this opinion is presented for purposes of explaining the reasons behind the Court's ruling.

In its argument to the Court, the INS first contended that the Court could not properly review the question of the requirement of a medical certificate in excluding homosexual aliens because Hill had left the United States. The INS asserted that due to Hill's departure, Hill lost standing, Hill was no longer in custody, the petition for writ of habeas corpus had become moot, and Hill had not exhausted his administrative remedies.

It was learned at the hearings held in this action that Hill returned to Great Britain before the decision by the Board of Immigration Appeals. Despite this fact, the Court found that the custody requirement was met, and found that even if the petition for writ of habeas corpus had become moot, the repetition/evasion exception to the mootness doctrine applied to permit the Court to review the issue raised by petitioner.

The essence of the argument made by the INS is that when Hill departed the United States, any outstanding controversies as to his first attempted entry into the United States lost all significance, asserting that if Hill wished to return to the United States, entirely new entry proceedings would be commenced, the outcome of which would not be dependent upon decisions made with respect to this earlier attempted entry.[3]

---

3. It should be noted at this point that Hill did return to the United States on the eve of the

hearing in this matter. The INS asserts that he

Thus, the INS asserts that by his departure, Hill lost his chance to obtain review of the Board of Immigration Appeals' decision. These assertions made by the INS boil down to whether the custody requirement for habeas corpus relief is met, and whether the petition for writ of habeas corpus has been rendered moot.

■ The Immigration and Naturalization Act, and regulations, preclude habeas corpus review in certain classes of cases where the alien seeking admission has subsequently departed the United States. 8 U.S.C. § 1105a(c) provides that an order of deportation or exclusion may not be reviewed by the court if the alien has departed from the United States after issuance of the order. And section 3.4 of Title 8 of the Code of Federal Regulations provides that the departure from the United States of a person who is subject to deportation proceedings after he or she has taken an appeal, but before the decision on the appeal has been rendered, constitutes a withdrawal of the appeal, and the earlier decision then becomes the final decision as though no appeal had been taken. However, neither the statute nor the regulation apply to the facts of the present case. Hill left the United States after the decision of the immigration judge but before the decision by the Board of Immigration Appeals. The immigration judge had ordered Hill admitted, but this order was stayed pending the INS appeal to the Board of Immigration Appeals. Though the Board of Immigration Appeals eventually ordered Hill excluded and deported, Hill had left the United States before this order was entered. As there was no order of exclusion or deportation outstanding against Hill when he left the United States, the statute and regulation specifically prohibiting judicial review are not applicable to the present case and do not preclude this Court's review of Hill's petition. The Court has found no other provisions of the Immigration and Nationality Act, or any applicable regulations, that specifically preclude this Court's review.

The Court, therefore, must look to case law, and the principles enunciated therein, to determine whether it is proper to review the claim made by Hill. Though the parties presented analyses of a number of cases allegedly supporting their positions as to the jurisdiction of this Court to review Hill's claims, these cases by and large are inapplicable to the facts of this case. The cited cases primarily addressed review under the Administrative Procedure Act, *see, e.g., Brownell v. Tom We Shung,* 352 U.S. 180, 77 S.Ct. 252, 1 L.Ed.2d 225 (1956); *Kokoris v. Johnson,* 195 F.2d 518 (4th Cir. 1952); *Estrada v. Ahrens,* 296 F.2d 690 (5th Cir. 1961), or the situation where the alien had already been ordered deported or excluded before departing the United States, *see, e.g., Andgoulapos v. Johnson,* 195 F.2d 444 (4th Cir. 1952); *Bogiatizis v. Hall,* 195 F.2d 661 (9th Cir. 1952).

■ The Court finds the custody requirement to be met. Sufficient "custody" for purposes of habeas corpus relief is found when there exists "any significant restraint on liberty." *U. S. v. District Director of Inspection,* 634 F.2d 964, 967 (5th Cir.), *cert. denied,* 452 U.S. 917, 101 S.Ct. 3052, 69 L.Ed.2d 421 (1981), and the Supreme Court notes in *Brownell v. Tom We Shung,* 352 U.S. at 180, 77 S.Ct. at 252, 1 L.Ed.2d at 225, that "[a]liens excluded [from] entry into the United States have been allowed habeas corpus relief though free to go anywhere in the world." Hill can be considered to be in custody in several respects. First,

was permitted to *enter,* and this entry proves that once Hill left the United States after his first attempted entry, all outstanding proceedings in connection therewith became moot as new proceedings were required for new entries.

However, the Court cannot look to Hill's return as a new entry defeating this Court's jurisdiction over Hill's petition for two reasons. First, the INS could have allowed him to enter, despite knowing he was a homosexual, for purposes of rendering these proceedings moot. Second, there is an outstanding preliminary injunction order issued by this Court in the Lesbian/Gay Freedom Day Committee action that prohibited the INS from excluding aliens from entry solely on the grounds they are believed to be homosexuals. Only after the thirty days for further INS proceedings had passed, was Hill deemed to have *entered* the United States.

despite the assertions by the INS, the decision by the Board of Immigration Appeals can severely affect Hill when he again seeks entry into the United States. 8 C.F.R. 3.1(g) provides:

> Except as they may be modified or overruled by the Board or the Attorney General, decisions of the Board shall be binding on all officers and employees of the Service in the administration of the act.

Due to this binding effect of the decision by the Board of Immigration Appeals, it is likely that Hill will be continually barred from entry into the United States as long as a policy of excluding homosexuals per se from entry is in effect. The Board's decision states that Hill admits that he is a homosexual. Thus, under INS policy, Hill is excludable. Each time Hill seeks a new entry into the United States, pursuant to 8 C.F.R. 3.1(g) the immigration inspector is obligated to apply, and is bound by, the Board's previous decision stating that Hill is a homosexual and ordering him excluded as a homosexual. Unless Hill chooses to try to prove that he is no longer a homosexual, the binding effect of the decision by the Board stating that Hill is a homosexual and is excludable will preclude his entry. The Court finds this result to be a significant restraint upon Hill's liberty, and of sufficient collateral consequence, to find Hill "in custody" for purposes of habeas corpus review.

A second reason the Court finds Hill to be in custody is due to the statement by the INS that it was possible that if Hill had sought to withdraw his appeal, or if the Board had known that Hill had left the country prior to the issuance of its decision, it might still have rendered a decision on the appeal for "law enforcement reasons." Respondent's Supplemental Memorandum (April 20, 1982), pp. 10–11. If the Board could have so entered a binding (*see* 8 C.F.R. 3.1(g)) decision with respect to the ability of Hill to enter the United States, he also must be allowed to obtain review of that binding decision and so must be considered to be in custody.

■ As to mootness of Hill's petition, it would appear that the petition is moot. Hill left the United States once he had accomplished the purpose for which he sought entry, that is, a temporary visit for pleasure. Therefore, Hill's original request for entry into the United States may have become moot. But if the petition has been rendered moot by Hill's departure from the United States, the repetition/evasion exception to the mootness doctrine clearly applies, and this Court has jurisdiction to consider Hill's claim.

The repetition/evasion exception to the mootness doctrine exists so that jurisdiction cannot be defeated by "short term orders, capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed.2d 310 (1911). Both the repetition and evasion portions of the exception must be satisfied for the exception to apply.

■ As to repetition, the challenged law or conduct for which review is sought must be possible of repetition, and the chance of repetition must be of some certainty, and not remote or speculative. *Williams v. Alioto*, 549 F.2d 136, 142 (9th Cir. 1977). Additionally, there must be a possibility of repetition of the challenged action to the litigant who is asserting the mootness exception. *Id.* at 144. These considerations are met in the present case. Repetition of INS exclusion of alien homosexuals without a medical certificate is not only possible, but likely, and the repetition is likely to affect Hill as well as other homosexual aliens. As earlier discussed, section 3.1(g) provides that the decision of the Board of Immigration Appeals is binding. Thus, the decision can be asserted against Hill when he seeks to make a subsequent entry into the United States. It is probable that Hill will make other attempts to enter the United States as a visitor. Thus, there exists a clear possibility of repetition of the challenged INS action. Additionally, the decision, as binding upon officers and employees of the Service in the administration of the Act, can be used as a basis for excluding other aliens suspected of being homosexuals

from entry into the United States. Repetition of the challenged actions of the INS in this respect is exceedingly possible, if not certain.

■ The repetition portion of the mootness exception being met, the inquiry turns to the evasion portion of the exception. The evasion requirement is met where "the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration," *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975), and when the case is "within a class normally incapable of appellate review because of the lapse of time." *Williams v. Alioto,* 549 F.2d at 142. Additionally, "[I]n making its decision on evasion, a court examines a variety of factors such as the probability that a subsequent suit challenging the action will be brought and the likelihood that it will reach appellate review. *Id.* Again, these considerations are met by the present case. Like Hill, a large percentage of aliens seeking entry into the United States are persons making only a temporary visit, *i.e.,* a vacation. Review of an exclusion though the Board of Immigration Appeals, and then through the district court, is a time-consuming process involving anywhere from six months to numbers of years.[4] Persons who seek to enter the United States for only a short period will not wish, or be able to, remain in the United States for a period of time significantly longer than their originally planned trip in order to challenge the exclusion procedures of the INS. The requirements of job and family would prevent such a stay in most cases, and it is unreasonable to require such a stay to challenge

an INS procedure that affects for the most part temporary visitors. Thus, the challenged actions are within a class normally incapable of review due to lapse of time because those affected by the INS exclusion procedure would be unable to remain in the United States for the period of time necessary to complete the challenge. It should be noted that due to the current active involvement of many groups in pursuing the rights of homosexual persons, it is exceedingly likely that a subsequent suit challenging the actions presented by the present case would be brought if the Court did not permit review, but then again, such suit would likely face the same challenges to review as presented by the INS in this case due to the incapacity of such a case to complete review.

The Court therefore finds that the custody requirement has been met, and if moot this action qualifies for the repetition/evasion exception to the mootness doctrine. The Court will now examine the merits of the petition filed by Hill.

■ A reading of the applicable portions of the Immigration and Nationality Act, and corresponding legislative history, indicates the intent of Congress that homosexuality be a medical exclusion, and that therefore a medical certificate is required to exclude a homosexual from entry into the United States. The excludable aliens statute places persons afflicted with a psychopathic personality, sexual deviation, or a mental defect among six other classes of aliens excludable for *medical* reasons.[5] The statutes governing the detention, observation and examination of arriving aliens also reaffirm the medical basis for the exclusion

---

4. Hill's challenge has lasted one and one-half years, thus far.

5. 8 U.S.C. § 1182(a)(1) Aliens who are mentally retarded;
   (2) Aliens who are insane;
   (3) Aliens who have had one or more attacks of insanity;
   (4) Aliens afflicted with psychopathic personality, or sexual deviations or a mental defect;
   (5) Aliens who are narcotic drug addicts or chronic alcoholics;

(6) Aliens who are afflicted with any dangerous contagious disease;
(7) Aliens not comprehended within any of the foregoing classes who are certified by the examining surgeon as having a physical defect, disease, or disability . . . of such a nature that it may affect the ability of the alien to earn a living.
Section 1182(a) then proceeds to enumerate 26 other classes of excludable aliens none of which constitute medical grounds for exclusion, *i.e.,* paupers (1182(a)(8)), anarchists (1182)(a)(28)(A)), etc.

of homosexuals, and point out the requirement of obtaining a medical certificate to exclude.

8 U.S.C. § 1222 provides for the detention of aliens suspected of being afflicted with a physical or mental defect:

> For the purpose of determining whether aliens (including alien crewmen) arriving at ports of the United States belong to any of the classes excluded by this chapter, by reason of being afflicted with any of the diseases or mental or physical defects or disabilities set forth in section 1182(a) of this title, ... such aliens shall be detained ... for a sufficient time to enable the immigration officers and medical officers to subject such aliens to observation and an examination sufficient to determine whether or not they belong to the excluded classes.

As to such examinations, 8 U.S.C. § 1224 provides:

> The physical and mental examination of arriving aliens (including alien crewmen) shall be made by medical officers of the United States Public Health Service, who shall conduct all medical examinations and shall certify, for the information of the immigration officers and the special inquiry officers, any physical and mental defect or disease observed by such medical officers in any such alien. If medical officers of the United States Public Health Service are not available, civil surgeons of not less than four years' professional experience may be employed for such service upon such terms as may be prescribed by the Attorney General. Aliens (including alien crewmen) arriving at ports of the United States shall be examined by at least one such medical officer or civil surgeon under such administrative regulations as the Attorney General may prescribe, and under medical regulations prepared by the Surgeon General of the United States Public Health Service. Medical officers of the United States Public Health Service who have had special training in the diagnosis of insanity and mental defects shall be detailed for duty or employed at such ports

of entry as the Attorney General may designate, and such medical officers shall be provided with suitable facilities for the detention and examination of all arriving aliens who it is suspected may be excludable under paragraphs (1) to (4) or (5) of section 1182(a) of this title, and the services of interpreters shall be provided for such examination. Any alien certified under paragraphs (1) to (4) or (5) of section 1182(a) of this title, may appeal to a board of medical officers of the United States Public Health Service, which shall be convened by the Surgeon General of the United States Public Health Service, and any such alien may introduce before such board one expert medical witness at his own cost and expense.

The power of the immigration officer with respect to medical matters is specifically limited by 8 U.S.C. § 1225(a):

> (a) The inspection, other than the physical and mental examination, of aliens (including alien crewmen) seeking admission or readmission to or the privilege of passing through the United States shall be conducted by immigration officers, except as otherwise provided in regard to special inquiry officers....

8 U.S.C. § 1226(d) sets forth the effect of medical certificates in exclusion proceedings:

### Physical and mental defects

> (d) If a medical officer or civil surgeon or board of medical officers has certified under section 1224 of this title that an alien is afflicted with a disease specified in section 1182(a)(6) of this title, or with any mental disease, defect, or disability which would bring such alien within any of the classes excluded from admission to the United States under paragraphs (1) to (4) or (5) of section 1182(a) of this title, the decision of the special inquiry officers shall be based solely upon such certification. No alien shall have a right to appeal from such an excluding decision of a special inquiry officer. If an alien is excluded by a special inquiry officer because of the existence of a physical disease, defect, or disability, other than one

specified in section 1182(a)(6) of this title, the alien may appeal from the excluding decision in accordance with subsection (b) of this section, and the provisions of section 1183 of this title may be invoked.

The Court holds that the congressional decision to exclude homosexuals from entry into the United States is based upon the premise that homosexuality is a medical illness. Congress uses medical terms in defining the excludable class in 8 U.S.C. § 1182(a)(4). "Psychopathic personality," "sexual deviation," and "mental defect" are all medical terms used by the American Psychiatric Association in listing what it considers to be mental disorders. The structure of the Act evidences Congress' intention that "psychopathic personality," "sexual deviation," and "mental defect" constitute medical grounds for exclusion from the United States. 8 U.S.C. § 1224 requires that *medical officers* with special training in the *diagnosis of insanity and mental illness* be assigned, and provided with appropriate facilities, for detaining and examining aliens suspected of being excludable under 1182(a)(4). Section 1224 also provides for an appeal to a board of *medical officers* from a certification under section 1182(a)(4), where the alien may introduce one expert *medical witness.* Section 1226(d) refers to the *medical certification* of an alien afflicted with a *mental disease, defect or disability* which would make the alien excludable under section 1182(a)(4).

The legislative history of section 1182(a)(4) also evidences this intent. In the House Report on the 1952 Act, 1182(a)(4) is defined as a "medical grounds for exclusion." H.Rep.No. 1365, 82nd Cong.2d Sess., reprinted in 1952 U.S.Code Cong. & Ad. News 1653, 1698. In connection with the formulation of the Act, the House relied upon a report by the Public Health Service on the medical aspects of the bill, which the House included in its Report. In the PHS report it is noted that homosexuality is such a *medical* grounds for exclusion. *Id.* at 1699–1700.

In the legislative history behind Congress' decision to add the term "sexual deviation" to the Act, the intent that this exclusion be a medical one is apparent. Present in the Congressional Record are statements such as: "Sexual deviation . . . by using the precise medical term," 111 Cong.Rec. 21772 (1965), "definitions of unfitness have been refined to conform with new medical or psychological knowledge," *Id.* at 21771, "[T]hose persons classified under the medical term of 'sexual deviation,' " *Id.* at 21586, "[M]ental and physical conditions warranting excludability . . . have been clarified and made to conform with recent advances in medical science." *Id.* at 21782.

The Court holds that exclusion based upon a medical ground for exclusion must be based upon a medical certificate that certifies that the alien is afflicted with such a medical defect. The Act nowhere provides that an immigration officer may make the determination that an alien is afflicted with a medical condition that constitutes a medical exclusion to admission. Rather, exclusive authority over such medical determinations is placed in the Public Health Service officers (or designated civil surgeons). 8 U.S.C. §§ 1224, 1225. Further, 8 U.S.C. sections 1222 and 1224 indicate that an alien suspected of a physical or mental defect must be examined by a medical officer. And finally, as the certification by the medical officer constitutes the sole evidentiary basis for exclusion, 8 U.S.C. § 1226(d), the statutes must be construed to *require* such a certification to exclude an alien based upon a mental or physical defect.

Courts have either held, or implied, that a medical certificate must be obtained to exclude an alien under one of the medical grounds for exclusion set forth in the Act. In the lower court's opinion in *Boutilier v. INS,* 363 F.2d 488 (2nd Cir. 1966), aff'd, 387 U.S. 118, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967), the Second Circuit implied that a medical examination was an indispensable prerequisite to an exclusion proceeding based upon the medical exclusion "psychopathic personality." *Id.* at 492. In *U.S. v. Esperdy,* 277 F.2d 537 (2nd Cir. 1960) the applicant for a visa stated on her applica-

tion "I am or have been afflicted with tuberculosis." However, the court required that the exclusion be based upon a Class A medical certificate issued by a PHS officer. *Id.* at 538–39. It was directly held in *In re Naturalization of Hollinger,* 211 F.Supp. 203, 206 (E.D.Mich.1962), that the only evidence upon which a finding of insanity can be made for purposes of an exclusion proceeding is a certification by a medical officer under 8 U.S.C. § 1224. As cases hold that an exclusion on medical grounds must be based upon a medical certificate, an exclusion under section 1182(a)(4), *a medical ground for exclusion,* must be based upon such a certificate.

The INS asserts that the statements made by Hill can constitute sufficient grounds to exclude him under section 1182(a)(4) as Hill, by his statements, failed to meet his burden of proof to establish that he was eligible to enter the United States and not subject to an exclusion. *See* 8 U.S.C. § 1361. The statutory interpretation of the Act, and the above-discussed cases, establish that statements of the applicant cannot be the basis for a medical grounds of exclusion. Though statements of an alien that he or she belongs to an excluded class at the time of entry can be a legitimate basis for exclusion of persons based upon non-medical grounds for exclusion, *see, e.g., Vajtauer v. Comm'r of Immigration,* 273 U.S. 103, 110–11, 47 S.Ct. 302, 305–06, 71 L.Ed. 560 (1927) (advocating overthrow of the government), exclusion of an alien based upon a medical ground for exclusion must be accompanied by a Class A certificate certifying that the alien is afflicted with an excludable physical or mental defect.

The Court holds that the INS' attempt to exclude Hill from entry into the United States as a person afflicted with a sexual deviation without a medical certificate, and the Board of Immigration Appeals' decision approving such a procedure, constitutes an abuse of discretion. Accordingly, the Court grants Hill's petition for writ of habeas

corpus. The thirty-day time period for further INS exclusion proceedings having elapsed, the Court finds Hill to be admitted to the United States as a visitor for pleasure.

### *Lesbian/Gay Freedom Day Committee v. INS*

Plaintiffs Lesbian/Gay Freedom Day Committee, Inc. and various officers of the Committee bring this action for declaratory and injunctive relief against the Immigration and Naturalization Service and the Attorney General for violation of their First Amendment rights to free speech and association.[6]

The Committee and its officers organize and produce an annual event, held in San Francisco, designed to promote the rights of homosexual persons. The event includes a parade and speeches advocating gay rights. Lesbians and gay men from throughout the world are invited to attend the event and to participate by sharing their experiences and insights relative to the social and political positions of homosexual persons in their countries with United States citizens who are homosexual. Homosexual aliens have appeared as speakers at past events. Plaintiffs allege that the new policy of the INS, which excludes homosexual aliens from entry into the United States based upon statements made by the alien or by a third party, to an immigration inspector, deprives plaintiffs of their First Amendment rights to communicate and associate with homosexuals from other countries in connection with the parade and celebration activities. Plaintiffs seek a declaration from the court that defendants' policy, practices and actions violate their constitutional rights, and seek a permanent injunction enjoining such policy, practices and actions.

Plaintiffs' complaint was filed on June 22, 1981, six days before the 1981 parade and celebration was scheduled to take place. The Court denied plaintiffs' motion for a temporary restraining order for lack of a sufficient evidentiary showing, but later granted plaintiffs' motion for preliminary

---

6. In their complaint, plaintiffs also sued for violation of their rights to equal protection and to privacy. These claims are not currently being pursued.

injunction enjoining defendants from interfering with the entry of aliens solely on the grounds that the aliens are, or are believed to be, homosexuals. In granting the preliminary injunction, the Court found that there were sufficiently serious questions going to the merits of plaintiff's action to be deserving of litigation in light of the preponderance of medical evidence that homosexuality is not a mental disease, disorder or psychopathic personality trait. The Court found the balance of hardships to tip decidedly toward plaintiffs because a failure to enter a preliminary injunction would deprive plaintiffs of significant First Amendment rights, and because the INS asserted no harm that could come to it, or to the public, by entry of the injunction and no interest of the government in maintaining the exclusionary policy.

Plaintiffs move for summary judgment contending that there is no triable issue of fact that plaintiffs are entitled to declaratory and permanent injunctive relief. Defendants move to dismiss plaintiffs' demand for entry of a permanent injunction contending that there is no triable issue of fact that plaintiffs are not entitled to the sought-after injunction.

The essence of plaintiffs' challenge to the INS policy providing for the exclusion of aliens based upon statements made to immigration inspectors is that this policy excludes homosexuals solely because they are homosexuals. Plaintiffs assert that in light of the medical profession's determination that homosexuality can no longer be considered to be a medical illness or mental disorder, the INS policy is not in accord with the intent of Congress, and violates plaintiffs' First Amendment rights.

Whether plaintiffs can succeed on their complaint depends largely upon the extent to which the facts presented by their action can be reconciled with, and distinguished from, three weighty Supreme Court cases: *Boutilier v. Immigration and Naturalization Service*, 387 U.S. 118, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967), *Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683

(1972), and *Fiallo v. Bell*, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977). These cases will be discussed by the Court before it presents the arguments of the parties with respect thereto.

In *Boutilier v. Immigration and Naturalization Service*, 387 U.S. 118, 87 S.Ct. 1563, 18 L.Ed.2d 661, the Supreme Court interpreted the term "afflicted with a psychopathic personality," appearing in the 1952 version of the Immigration and Naturalization Act, as evidencing a clear intent by Congress to exclude homosexuals from entry into the United States. In that case Boutilier, an admitted homosexual, was certified as being afflicted with a psychopathic personality, namely, sexual deviance. *Id.* at 120, 87 S.Ct. at 1565. At that time the Immigration and Naturalization Act provided that aliens "afflicted with psychopathic personality, epilepsy, or a mental defect" were to be excluded from admission into the United States.[7] Mr. Boutilier had claimed that a person could not properly be considered to be afflicted with a psychopathic personality merely because he or she was a homosexual, and also contended that the term psychopathic personality was void for vagueness. *Id.*

The Supreme Court analyzed the legislative history of the 1952 version of the Act and held that this history indicated "beyond a shadow of a doubt that the Congress intended the phrase 'psychopathic personality' to include homosexuals . . . ." *Id.* Apparently, an earlier bill had specifically stated that homosexuals were to be an excludable class, but this language was later omitted and only the "psychopathic personality" phrase remained. The Senate Report of the bill, however, stated that although the specific references to homosexuals had been omitted, the Public Health Service advised that the term was sufficiently broad to provide for the exclusion of homosexuals and sex perverts. The Report also specified that the "change in nomenclature is not to be construed in any way as modifying the intent to exclude all aliens who are sexual

---

7. *See, infra*, the discussion of the 1952 version

of the Act in the Hill portion of this Opinion.

deviates." *Id.* at 121, 87 S.Ct. at 1565 and see S.Rep.No. 1515, 81st Cong., 2d Sess. The House Report, H.Rep.No. 1365, 81st Cong., 2d Sess., also indicated that the term "psychopathic personality" was used to specify certain types of "pathologic behavior" such as homosexuality or sexual perversion. Id. at 122, 87 S.Ct. at 1566.

Rather than looking at the question of whether homosexuality was a medically recognized form of "psychopathic personality," the Supreme Court looked only to the intent of Congress. It held: "We, therefore, conclude that the Congress used the phrase 'psychopathic personality' not in the clinical sense, but to effectuate its purpose to exclude all homosexuals and other sex perverts." *Id.* at 122, 87 S.Ct. at 1566. The Court later explained this statement:

> "It may be . . . that 'psychopathic personality' is a medically ambiguous term, including several separate and distinct afflictions. . . . But the test here is what the Congress intended, not what differing psychiatrists may think. It was not laying down a clinical test, but an exclusionary standard which it declared to be inclusive of those having homosexual and perverted characteristics. It can hardly be disputed that the legislative history of § 212(a)(4) clearly shows that Congress so intended. *Id.* at 123, 87 S.Ct. at 1566.

As to the void for vagueness doctrine, the Court held that as the "psychopathic personality" exclusion relates to past conduct, and the void for vagueness doctrine is based upon the constitutional requirement of fair warning, the doctrine did not apply. *Id.* at 123, 87 S.Ct. at 1566.

In *Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), the Supreme Court addressed the standard of review to be applied when a constitutional challenge is presented to an INS action allegedly taken in pursuance of the Immigration and Naturalization Act. In that case, as in the present case, the challenging plaintiffs were citizens of the United States, asserting that their First Amendment rights to free speech were violated by a refusal to allow an alien to visit the United States. Specifically, the INS refused to allow Ernest M. Mandel, a noted Marxist scholar, to visit the United States to participate in conferences and in lectures at United States universities. Mandel was excluded under 8 U.S.C. § 1182(a)(28), which excludes aliens who advocate communism or write or publish doctrines of communism. The Attorney General also refused to waive the application of subsection (a)(28) to permit temporary admission, as he is permitted to do under 8 U.S.C. § 1182(d)(3)(A). Plaintiffs, scholars and United States citizens, alleged that their First Amendment rights were violated by the refusal of the INS and the Attorney General to admit Mandel to the United States as they were prevented from hearing Mandel's views and engaging him in a free and open academic exchange. *Id.* at 760, 92 S.Ct. at 2580.

The Supreme Court held that though an unadmitted and nonresident alien has no constitutional right of entry, citizens of the United States do have a First Amendment right to hear, speak and debate with the alien, and that these First Amendment interests might conceivably require the admission of the alien. *Id.* at 762–65, 92 S.Ct. at 2581. But despite the recognition of First Amendment interests, the Court held that only a limited scope of review would be applied in determining whether a First Amendment violation had occurred.

In so holding, the Court emphasized the plenary power of Congress to make rules for admission of aliens and to exclude those who possess the characteristics that Congress has forbidden. *Id.* at 766, 92 S.Ct. at 2583. The Court emphasized one of its previous holdings that "over no conceivable subject is the legislative power of Congress more complete than it is over" the admission of aliens. *Id., at see Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909). However, the Court decided to focus on the exercise of discretion by the Attorney General in refusing to waive the application of the exclusion statute rather than on the validity of the statute itself. The Court

held that when Congress had delegated conditional exercise of its power to exclude aliens to the executive branch, "when the Executive exercises this power negatively on the basis of a facially legitimate and bona fide reason, the court will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant." *Id.* 408 U.S. at 770, 92 S.Ct. at 2585. The Court found that the reason the Attorney General failed to waive the application of the statutory exclusion was facially legitimate and bona fide, thus ending further consideration by the Court. *Id.* at 769, 92 S.Ct. at 2585. Interestingly, the Court noted that "[w]hat First amendment or other grounds may be available for attacking exercise of discretion for which no justification whatsoever is advanced is a question we neither address nor decide in this case." *Id.* at 770, 92 S.Ct. at 2585. Thus, as long as a decision by immigration authorities is made on the basis of a facially legitimate and bona fide reason, constitutional review of that decision ends.

■ The question left open by the Court in *Kleindienst v. Mandel,* of whether this limited standard of review will also be applied to constitutional challenges to enactments by Congress relating to immigration, was resolved in *Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977). In that case the Supreme Court faced a challenge to the provisions of the Immigration and Nationality Act providing special preference immigration status to aliens who qualify as the illegitimate child of a United States resident, or the parent of an illegitimate child who is a United States resident, where the preference is sought through the natural mother, but not where the preference is sought through the natural father. 8 U.S.C. § 1101(b); *Fiallo v. Bell,* 430 U.S. at 788–89, 97 S.Ct. at 1476. After citing the now familiar doctrines of the plenary power of Congress over immigration matters, and stating that "the power over aliens is of a political character and therefore subject only to narrow judicial review," the Court found "no reason to re-

view the broad congressional policy choice at issue here under a more exacting standard than was applied in *Kleindienst v. Mandel.*" *Id.* at 795, 97 S.Ct. at 1479, *and see Adams v. Howerton,* 673 F.2d 1036, 1041–42 (9th Cir. 1982). Thus, the exercise of Congressional power over immigration matters is subject to the same limited judicial review applied to discretionary acts of the executive with respect to immigration matters. *Id.* 430 U.S. at 793, fn. 5, 795, fn. 6, 97 S.Ct. at 1478, fn. 5, 1479, fn. 6.

■ Pursuant to such review, the court looks to see if the congressional decision or executive action is based upon a facially legitimate and bona fide reason. If the court so determines, the statute or action is determined to be constitutional and review ends. *Id.* at 799–800, 97 S.Ct. at 1481–1482. Presumably, if the court finds that there is no facially legitimate and bona fide reason behind Congress' enactment or the executive action, it then balances the interests of Congress in enacting the legislation or the executive in taking the action against the First Amendment interests being infringed by the legislation or executive action to determine whether the legislation or action is constitutional. *See Kleindienst v. Mandel,* 408 U.S. at 765, 92 S.Ct. at 2582.

Having discussed these key cases, the Court now turns to the positions of the parties. The INS opposition to plaintiffs' motion for summary judgment is essentially identical to its motion to dismiss, the INS asserting these cases require that the Court find the INS policy to be based upon a facially legitimate and bona fide reason, and so find the policy to be constitutional. Plaintiffs assert the contrary.

Plaintiffs first contend that by section 1182(a)(4) Congress did not intend to exclude alien homosexuals from admission into the United States once it was medically determined that homosexuality per se was no longer considered to be a mental disorder or sexual deviation. Thus as the INS policy excludes homosexuals per se, it violates Congressional intent and so is invalid. Plaintiffs argue that Congress intended to

exclude homosexuals as having a sexual deviation or mental disorder based upon medical authority at that time that viewed homosexuality as a medical illness, specifically a mental disorder classified as sexual deviance. If medical authority changed, and no longer considered homosexuality to be a medical illness at all, then Congress intended that the INS could no longer exclude homosexuals from entry under the medical exclusion set forth in 8 U.S.C. § 1182(a)(4) as sexual deviants. In support of its interpretation of Congressional intent plaintiffs make two assertions. First, Congress required medical certification of persons excludable under section 1182(a)(4). This evidences Congress' intent to rely upon current medical opinion in determining whether an alien is excludable from entry into the United States. Thus, the term sexual deviation as it appears in section 1182(a)(4) is not to be an inelastic exclusion of homosexuals. Second, plaintiffs assert that if Congress intended to exclude homosexuals from entry irrespective of medical opinion as to whether homosexuality was considered to be a mental disorder, it would have specifically stated that homosexuals were a class of aliens excludable from entry into the United States.

The assertion that the term "sexual deviation" was not to be an inelastic opinion, but rather expands and contracts to current medical opinion, cannot be fully accepted due to the decision of the Supreme Court in *Boutilier*. The Supreme Court there decided that Congressional use of the term 'psychopathic personality' was not to invoke a "clinical" test. *Boutilier*, 387 U.S. at 123. Therefore a change in medical thinking that homosexual persons were no longer considered to be afflicted with a "psychopathic personality," but were considered to be afflicted with a "sexual deviation," would not affect the exclusion from admission of homosexual aliens. *Id.* The same congressional intent was evidenced in Congress' amendment to the Act in 1965. In the House and Senate Reports, S.Rep. 748, 89th Cong., 1st Sess., H.Rep. 745, 89th Cong., 1st Sess., reprinted in 1965 U.S.Code Cong. & Ad.News 3328, 3337, Congress indicated

that because there was question whether homosexuality was encompassed within the term "psychopathic personality," the term "sexual deviation" was added as a ground of exclusion. Thus, *Boutilier* authority precludes ascribing to Congress the intent that the term "sexual deviance" will not apply to exclude homosexual aliens if medical opinion determines that homosexuality per se is no longer considered to be a sexual deviation, but is considered to be some other form of mental illness.

However, *Boutilier* authority is not controlling where the medical profession has not changed the medical illness label applied to a homosexual, (the situation in *Boutilier*), but rather has determined that homosexuality is no longer a medical illness, mental disorder, or a sexual deviation at all. As discussed in the first portion of this opinion, medical authorities now have determined that homosexuality per se is not a mental disorder or sexual deviation. As discussed in the next portion of this Opinion, dealing with Hill's petition for a writ of habeas corpus, Congress intended that alien homosexuals be excluded from the United States because they were considered to be afflicted with a mental disorder. Section 1182(a)(4) is a *medical* exclusion to admission to the United States. Once medical authorities decided that homosexuality per se was no longer a medical problem of any type, the court cannot ascribe to Congress an intention that homosexuals still be excluded from entry due solely to their homosexuality as the reason Congress originally intended to exclude them no longer exists.

When *Boutilier* was decided there was no dispute among medical authorities that homosexuality was a mental disorder; the only dispute was in classifying which disorder homosexuality came within. The *Boutilier* Court apparently recognized that homosexuals were to be excluded from entry into the United States for medical reasons by its use of medical terms in its opinion. And importantly, the problem presented by plaintiffs herein is not the problem of a "clinical" definition of homosexuality, *see Boutilier*, 387 U.S. at 123, 87 S.Ct. at 1566,

but rather whether a "clinical" problem exists at all. *Boutilier* does not preclude the Court from finding that Congress did not intend that homosexuals be excluded from entry into the United States solely because they are homosexuals once medical authorities have determined that homosexuality is not a medical illness, mental disorder, or sexual deviation, and the Court so finds this to be the congressional intent.

Once homosexuality was determined by the medical profession to not be a medical illness, mental disorder, or sexual deviation, no medical grounds for the exclusion of a homosexual due solely to his or her homosexuality exists. Section 1182(a)(4) was intended by Congress to be a medical ground for exclusion from the United States. Congress could not have intended that an alien who has no medically recognized mental disorder or sexual deviation be excluded under section 1182(a)(4). As homosexuality per se is no longer considered by medical authorities to be a mental disorder or sexual deviation, Congress could not have intended to exclude alien homosexuals per se from entry into the United States when medical authority shifted. Thus, exclusion under section 1182(a)(4) can only be accomplished if a medical officer certifies that the alien is afflicted with a currently recognized mental disorder. As the INS policy implementing section 1182(a)(4) acts to exclude homosexuals solely because they are homosexuals and solely based upon statements made to an immigration officer, and not because they have any medically recognized and certified mental disorder or sexual deviation, it is contrary to congressional intent and therefore invalid.

Plaintiffs next contend that if the INS policy for the exclusion of homosexuals under section 1182(a)(4) is not invalid as contrary to Congressional intent, it is invalid as a violation of plaintiffs' First Amendment rights to freedom of speech and association. *Kleindienst v. Mandel* permits plaintiffs to bring such a constitutional challenge. In

that case the Supreme Court stated that United States citizens have a First Amendment right to hear, and speak with, an alien. *Kleindienst v. Mandel*, 408 U.S. at 760, 92 S.Ct. at 2580. However, only a limited standard of review may be applied by the Court in addressing this challenge, that standard being that if the INS policy is based upon a legitimate and bona fide reason, further court review ends. *Id.* at 770, 92 S.Ct. at 2585.

The INS contends that even this limited standard of review cannot be applied to the INS policy excluding homosexuals, and in fact this policy is unreviewable, asserting that the INS exercises no discretion in excluding homosexual aliens from the United States, and pursuant to *Kleindienst v. Mandel* only discretionary acts of the executive are reviewable. This contention is without merit. As to the INS assertion that its policy of exclusion permits immigration officers no discretion in deciding what homosexual aliens to exclude, (*i.e.*, if the alien states that he or she is a homosexual, the alien is excluded, if not, the alien is not excluded), plaintiffs are not challenging these individual actions by INS officers. Plaintiffs are challenging the policy that was adopted, and not how that policy is administered. Certainly, the INS exercised discretion in deciding how to enforce section 1182(a)(4) against homosexual aliens once the Public Health Service had withdrawn its participation.

The INS also asserts that it exercised no discretion in adopting its policy that excludes homosexual aliens per se, because the INS is bound by an Act of Congress to so exclude homosexuals. The Court has held that an intent to exclude alien homosexuals in light of the medical community's decision that homosexuality is not a mental disorder or sexual deviation cannot be attributed to Congress. Thus, the INS decision that it had to continue to enforce section 1182(a)(4) against homosexual aliens was an exercise of discretion.[8]

---

8. If the Court were in error that such was the congressional intent, and the INS correct in its assertion that it was obligated to institute a

policy of per se exclusion of homosexual aliens and did not act with discretion, *Fiallo v. Bell* makes it clear that this congressional decision

To reiterate, pursuant to the *Kleindienst v. Mandel* and *Fiallo v. Bell* standard of review, when a court is presented with a constitutional challenge to an immigration decision by the executive or by Congress, the court determines whether that decision is based upon "a facially legitimate and bona fide reason." *Kleindienst v. Mandel*, 408 U.S. at 770, 92 S.Ct. at 2585. If the decision is based upon a facially legitimate and bona fide reason, court scrutiny of the statute ends. Thus, in the present case the Court must determine whether the INS policy of per se exclusion of homosexuals from entry into the United States is based upon a facially legitimate and bona fide reason.

Plaintiffs assert that the reason for the policy is not facially legitimate or bona fide because: (1) homosexuality per se is not a disease, defect, or deviation from psychiatric and medical normalcy; (2) the exclusion of homosexuals serves no cognizable governmental interest nor any public interest; (3) exclusion of homosexuals from entry is irrational and baseless.

■ The Court holds that the INS policy of excluding alien homosexuals from entry into the United States pursuant to 8 U.S.C. § 1182(a)(4) solely on the grounds of homosexuality is not based upon a facially legitimate and bona fide reason as medical authorities no longer recognize homosexuality per se to be a mental disorder of sexual deviation.

The INS policy is not based upon a facially legitimate or bona fide reason because, as earlier discussed, section 1182(a)(4) is a medical ground for excluding aliens from entering the United States. Medical au-

thorities no longer recognize homosexuality per se as a sexual deviation, a mental disorder, or a mental or medical illness of any type. Thus there was no legitimate or bona fide reason for the INS to institute a policy to exclude homosexuals based upon a medical exclusion when the medical basis for the exclusion no longer exists. As discussed earlier, Congress did not intend such a result, and the INS had no legitimate or bona fide reason to interpret section 1182(a)(4) in the manner it did in adopting its policy.[9]

A further reason that the INS policy is not based upon a legitimate or bona fide reason is that the INS has failed to assert any legitimate or bona fide interest of the INS, or the government, in excluding homosexuals from the United States solely on account of their homosexuality. No threat to the health, safety or national security of the United States has been asserted, nor can the Court find any to exist. The moral repugnancy to some United States citizens is not a legitimate or bona fide reason for exclusion. Nor is the fact that a few states still criminally punish homosexual sexual acts, as the policy of exclusion does not even address the "practicing" homosexual or the question of whether the homosexual alien intends to engage in homosexual acts while visiting the United States. It excludes all homosexuals whether "practicing" or not.

Having found the INS policy of the per se exclusion of homosexuals not to be based upon a legitimate and bona fide reason, the Court must now balance the interest of the INS in exacting the policy against the First Amendment interests of plaintiffs to determine whether the policy is or is not consti-

---

to exclude homosexuals per se is also subject to constitutional challenge, and to the same standard of review applied to executive actions. *Fiallo v. Bell*, 430 U.S. at 795, 97 S.Ct. at 1479. The Court's following discussion as to the constitutionality of the INS policy and per se exclusion of alien homosexuals from entry into the United States, could also apply to review of the constitutionality of the Congressional decision to exclude homosexuals per se, if that is deemed by another court to be the Congressional intent.

**9.** Again, if Congress intended a per se exclusion of homosexual aliens from entry into the United States, which of course the Court has not held, pursuant to *Fiallo v. Bell* the Court would find that this legislative decision is not based upon a legitimate or bona fide reason in light of present medical authority. When the reason for a rule ceases to exist, so too must the rule cease to exist. The medical reasons for which Congress originally based its decision to exclude homosexuals are no longer recognized. It is neither legitimate nor bona fide to continue such an exclusion when the reason for it is gone.

tutional. *Kleindienst v. Mandel*, 408 U.S. at 765, 92 S.Ct. at 2582; *and see* L. Tribe, American Constitutional Law 582 (1978). The Court holds that plaintiffs' First Amendment interests clearly outweigh any INS interest in a per se exclusion of homosexual aliens.

Plaintiffs assert very strong First Amendment interests in this case. Plaintiffs seek to engage in discussion and exchange with homosexual aliens. They seek to share information and ideas relating to the laws and attitudes regarding homosexuality in other countries in order to better deal with the laws and attitudes toward homosexuals in the United States. Through this sharing process plaintiffs also seek to improve the political position of homosexual groups in the United States, and to gain greater public acceptance for homosexual persons in the United States. These are well-recognized and compelling First Amendment interests.

It is clear that the INS policy of exclusion will significantly affect and restrict plaintiffs' First Amendment interests. The INS exclusionary policy will prevent and deter homosexual aliens from entering the United States to participate in the Lesbian/Gay Freedom Day events. Those aliens who assert that they are homosexuals at entry will be excluded. The possibility of exclusion at entry will deter other homosexual aliens from attempting to enter the United States. A further deterrence is that the application for a visa requires that the applicant state whether he or she is a member of any class of individuals excludable under any provisions of the Act, and the applicant is specifically asked on the application whether he or she is afflicted with a sexual deviation or mental defect. Defendants' memorandum of points and authorities in opposition to plaintiffs' motion for summary judgment (May 13, 1982), pp. 5–6. The failure to truthfully answer these questions can render the alien deportable and/or subject to prosecution. *Id.* Pursuant to INS policy, the homosexual applicant would be required to answer these questions affirmatively, or face possible deportation. This dilemma will cause homosexual aliens not to attempt to enter the United States for attendance at the Lesbian/Gay Freedom Day events.

As the Court has already discussed, the INS has asserted no legitimate governmental or public interest in its policy of excluding homosexual aliens on the sole grounds that they are homosexuals. Homosexual aliens pose no threat to national security merely because they are homosexuals. Nor do they pose a threat to the health, safety and welfare of the American public. The fact that some American citizens find homosexuality morally repugnant, or the purposes of the Lesbian/Gay Freedom Day events abhorrent or offensive, cannot provide an important governmental interest upon which an impairment to First Amendment freedoms can be based. *Gay Students Organization v. Bonner*, 509 F.2d 652, 662 (5th Cir. 1974). A governmental interest sufficient to justify an imposition on First Amendment rights cannot be based upon the content of the First Amendment expression: "No ideas are so far beyond the pale of the wider community's values that they are also beyond the boundaries of the First Amendment." *Toward a Gayer Bicentennial Committee v. Rhode Island Bicentennial Foundation*, 417 F.Supp. 632, 642 (D.R.I.1976); *and see Gay Students Organization*, 509 F.2d at 661. The asserted governmental interest that homosexual sexual activity is criminal in some states is also not a sufficient interest because the INS policy does not attempt to exclude only those homosexuals who may be entering the United States with a purpose of engaging in homosexual sexual activity. Rather, the policy excludes any person who is a homosexual, based merely on their "status" as a homosexual, without reference to their proposed activities within the United States.

There are also no alternatives available to plaintiffs to pursue their First Amendment interests. Due to the large number of aliens involved, it would be virtually impossible for plaintiffs to identify those persons excluded and deterred from entry into the United States in order to communicate with them. An alternative that plaintiffs travel

and hold a similar event abroad is unreasonable. The INS asserts that the homosexual aliens have the alternative of not admitting that they are homosexuals, because under INS policy they cannot be excluded. But this is not a legitimate alternative considering that such conduct could lead to deportation and/or prosecution due to a fraudulent entry.

In conclusion, the Court holds that the INS policy of excluding homosexuals per se violates plaintiffs' constitutional rights to freedom of speech and association. The First Amendment interests of plaintiffs far outweigh any governmental interest in the exclusionary policy, and there are no reasonable alternatives available to plaintiffs.

As the Court has explained, it believes that *Boutilier* permits the Court's rulings in this action. If another court were to decide differently, the Court wishes to offer a relevant quote from a legal sage:

> ... when a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment .... If judges have ... misinterpreted the mores of their day, or if the mores of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors.
>
> B. Cardozo, The Nature of the Judicial Process, 150, 152 (1921).

Good cause appearing therefor, the Court holds that the INS policy of per se exclusion of homosexual aliens from entry into the United States pursuant to 8 U.S.C. § 1182(a)(4) is invalid as contrary to Congressional intent, and as unconstitutionally abridging plaintiffs' First Amendment rights. Accordingly, the Court grants plaintiffs' motion for summary judgment, and denies defendants' motion to dismiss.

The Court further orders that the injunctive and declaratory relief sought by plaintiffs is granted, and plaintiffs are to submit to the Court a form of declaratory judgment and a form of permanent injunction, after approval by defendants' attorney as to form, for signature within ten (10) days of the date of this Order.

IT IS SO ORDERED.